**MASON–RUST, a Joint Venture,
Plaintiff,**

v.

**BUILDING MATERIAL, CONSTRUCTION, ICE AND COAL DRIVERS, HELPERS, WAREHOUSEMEN AND YARDMEN, LOCAL UNION NO. 682,** affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Defendant.

No. 68 C 380(A).

United States District Court,
E. D. Missouri, E. D.
March 31, 1971.

Gerald Tockman, McMahon & Berger, Clayton, Mo., for plaintiff.

Harry H. Craig, Wiley, Craig, Armbruster & Wilburn, St. Louis, Mo., for defendant.

## MEMORANDUM OPINION

HARPER, Senior District Judge.

This cause was tried to the court without a jury. The plaintiff is a joint venture composed of The Rust Engineering Company, a Delaware corporation, and The Mason & Hanger-Silas Mason Company, Inc., a West Virginia corporation. Defendant, Building Material, Construction Ice and Coal Drivers, Helpers, Warehousemen and Yardmen Local Union No. 682 (Local 682 or the Union) is a labor organization within the meaning of 29 U.S.C.A. § 152. This court has jurisdiction under Sections 301 and 303 of the National Labor Relations Act, as amended, 29 U.S.C.A. §§ 185 and 187.

Mason-Rust received a contract with the Corps of Engineers, United States Army, to perform construction work at the Gateway Army Ammunitions Plant at St. Louis, Missouri, to reactivate and convert the plant for the production of artillery shells. Mason-Rust employed members of defendant Union and operated with defendant pursuant to a collective bargaining agreement covering the period beginning May 1, 1966, and terminating April 30, 1969.

Mason-Rust has brought this action for damages allegedly sustained because of unfair labor practice in violation of the collective bargaining agreement and 29 U.S.C.A. § 158 occurring in August, 1968, during the course of work at the Gateway Army Ammunitions Plant (Gateway). Defendant Local 682 contends that the activity complained of was engaged in by virtue of and under a contractual right to do so.

The threshold issue in this case is defendant's contention that plaintiff is not the real party in interest and has not suffered any actual damages, and therefore is not entitled to bring this action. This action is based upon the fact that plaintiff's contract with the Army Corps of Engineers was a cost-plus-fixed-fee contract and that the plaintiff has been reimbursed for all items of damage here claimed. Plaintiff has admitted that any damages recovered will be turned over to the Army Corps of Engineers in accordance with Article 5 (f) of the contract between Mason-Rust and the Army Corps of Engineers. This exact question was recently answered by the Eighth Circuit Court of Appeals in Mason-Rust v. Laborers Local No. 42, Laborers International Union of North America, AFL–CIO, 435 F.2d 939, in which the plaintiff, a cost-plus-fixed-fee contractor, was allowed to recover damages resulting from a jurisdictional strike which had been reimbursed by the Army.

Mason-Rust can maintain this action under 29 U.S.C.A. § 187 allowing a party "injured in his business or property" to "recover the damages by him sustained and the cost of the suit." Mason-Rust, supra.

Plaintiff's contract with the Corps was effective September, 1967, and provided with respect to equipment supplied to plaintiff that "Title to all property furnished by the Government shall remain in the Government" (Article 14 (c)), and that "Upon the completion of

this contract, or at such earlier dates as may be fixed by the Contracting Officer, the Contractor * * * shall deliver or make such other disposal of such Government Property as may be directed by the Contracting Officer." Article 14 (i)).

On September 25, 1967, principal representatives of plaintiff and the Corps formulated plans for starting construction in preparation for a pre-job conference with building trade unions, including working out a Corps-required safety program involving maintenance of first aid facilities and an on-site ambulance. At the pre-job conference on October 5, 1967, defendant's business agent Stahl noted that an ambulance would be maintained on site and inquired as to who would drive the ambulance. Plaintiff's representative stated that Teamsters would drive the ambulance.

In late October or early November, 1967, plaintiff and defendant entered into a collective bargaining agreement which contained a job security provision as follows:

"Section 10.01. The terms and provisions of this Article have been negotiated and agreed upon by and between the parties for the purpose of providing covered employees with the maximum job security and steady employment warranted by the employer's business, and for the additional purpose of providing against the diminution of this Union's established wage scales and working conditions which may result if persons outside of the bargaining unit here involved or outside of other similar bargaining units are free to do like work for less.

"Section 10.02. The Employer shall not direct, require or knowingly permit any of its employees who are not included within the bargaining unit covered by this agreement to do or perform any of the work which is done or performed by those within this bargaining unit. Nor shall owners, Employers, those having a proprietary interest in the business, or persons outside of this bargaining unit, be directed, required or knowingly permitted to do or perform any of said work.

"Section 10.03. The Employer agrees to refrain from knowingly employing the services of any person who does not observe the wages, hours and conditions of employment established by this collective bargaining agreement on work covered by this Agreement."

On November 20, 1967, plaintiff issued Safety Issuance #6 which covered the operation and manning of the on-site ambulance during working hours and the circumstances when outside ambulance service would be available. Following the distribution of Issuance #6, defendant's principal officer, Walla, had several conversations with plaintiff's representative, Higgins, about the operation of the site ambulance. Walla testified that his primary concern was that plaintiff was going to use an outside ambulance service employing Teamster members other than members of defendant Local 682. Walla also testified that Higgins and Walla agreed that the ambulance maintained on the site would be driven only by member-employees of Local 682. On December 29, 1967, Project Manager Higgins determined that plaintiff would operate the site ambulance and man it with members of defendant Local 682 during the regular work week and whenever six or more construction trade employees were working at the site.

On August 7, 1968, resident Corps representative notified Project Manager Higgins that the ambulance which had been requisitioned for use on the job site was to be turned over to the Army for operation at Gateway by Chrysler Corporation. On August 9, 1968, the transfer was complete. On August 7, 1968, plaintiff advised defendant's business agent Stahl of the discontinuance of the operation of the site ambulance by Mason-Rust and the transfer by Corps. Stahl advised plaintiff's representative

Leithauser that he did not know if he could agree to the transfer but would check with Walla who was then out of town.

On August 14, 1968, defendant president Walla, Stahl, job steward Bommarito, and member-truck foreman, Jim Walla, met with representatives of plaintiff to discuss two written grievances presented by Jim Walla and Bommarito, and one oral grievance presented by president Walla, all of which basically demanded that plaintiff see to it that the site ambulance be driven by members of Local 682. Walla also demanded that the two filing written grievances be paid for time lost as a result of the transfer. Plaintiff's representative informed Walla of the release of the ambulance at the direction of the Corps and refused Walla's demands. Walla stated that the operation of the site ambulance was guaranteed work of the defendant Local 682 and that the defendant would be forced to take economic action in support of its demands. Walla refused to arbitrate the dispute and gave Melton twenty-four hours to confer with the Corps about the matter. Corps representative Rogers refused to change his directions to plaintiff when he was informed of defendant's grievances and the promised resort to economic action.

On August 16, 1968, Walla telephoned Melton and was advised by Melton that plaintiff would not employ defendant's members to operate a vehicle no longer in plaintiff's possession. Walla again refused to arbitrate the dispute. Shortly thereafter, Walla again telephoned Melton, and it was agreed that no action would be taken until Project Manager Higgins returned from vacation on August 26, 1968. According to Walla, the "guarantee" to defendant that its members would drive an ambulance as long as plaintiff was on the construction site was a verbal commitment made by Higgins in the fall of 1967.

On the afternoon of August 20, 1968, a building trades laborer employed by one of Chrysler's subcontractors was injured on the job site. The site ambulance was called, but would not start. An outside ambulance service was called, and left with the injured laborer by three o'clock p. m. At approximately 3:55 p. m. that afternoon Walla and the Union's foreman on the job went to Melton's office and explained that if a Local 682 member wasn't assigned to man a job site ambulance the Union was going to commence picketing. Walla explained to Melton that he felt the company had violated its agreement with the Union, and that he had satisfied his obligations under the contract and was free to resort to economic action if he chose. Melton again refused to comply with the Union's demands and picketing was commenced at Walla's authorization.

The picketing continued until approximately 11:00 a. m. on August 29, 1968, when it was discontinued as the result of a temporary restraining order issued by this court (No. 68C 389, Joseph H. Solien, Regional Director of the Fourteenth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board v. Building Material, Construction, Ice and Coal Drivers, Helpers, Warehousemen and Yardmen Local Union 682, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America). All entrances to the job site were picketed continuously, twenty-four hours a day, with the exception of an entrance reserved for the employees of the Chrysler Corporation. The pickets carried an umbrella with the legend "Teamsters Local Union on Strike", and a placard which read "Mason-Rust Contractors on Strike. We have no dispute with any other employer. Teamsters Local Union 682."

Defendant's defense is that its strike and picketing were directed at enforcing the provisions of its collective bargaining agreement with plaintiff. Defendant contends that by a verbal agreement between Project Manager Higgins and Local 682, President Walla entered into "either in October or November of the year 1967" (Tr. 132 Walla-Cross), plaintiff guaranteed that a job-site am-

bulance would be placed on the job by plaintiff and that members of defendant Local 682 would operate the ambulance. Defendant claims that once the work of manning the on-site ambulance was assigned to defendant, plaintiff was obligated under Article 10 of the collective bargaining agreement to see that no one but defendant Local 682 member employees operated the site ambulance, regardless of who possessed the ambulance.

■ The evidence demonstrates that defendant and its principal officer Walla knew as early as October 5, 1967, that the Corps required a site ambulance for safety and would provide a vehicle to Mason-Rust to be operated as a site ambulance. The evidence further demonstrates that Mason-Rust represented to defendant that members of defendant Local 682 would man the ambulance to be operated by Mason-Rust. But there is nothing in the evidence and nothing before this court to indicate that Mason-Rust ever represented to defendant that an ambulance other than the Corps vehicle would be provided or operated by Mason-Rust, or that Mason-Rust would provide a site ambulance irrespective of the subsequent disposition of the Corps vehicle. All parties knew that the site ambulance was provided by the Corps, required by the Corps, and would subsequently be returned to the Corps. The court finds that Mason-Rust did represent to defendant Local 682 that the Corps vehicle operated by Mason-Rust as a site ambulance would be driven only by member-employees of defendant Local 682. To that degree, the driving of the ambulance was work protected by Section 10.02 of the collective bargaining contract.

The court specifically finds that there was no guarantee or "verbal agreement" made by Mason-Rust that Mason-Rust would maintain a site ambulance other than the Corps vehicle or beyond the date at which Mason-Rust was no longer in possession of the Corps vehicle. Mason-Rust had no obligation to secure and maintain a site ambulance after the Corps repossessed the vehicle then used as a site ambulance.

The records show that the defendant by its officers, agents and stewards from August 20 through August 29, 1968, engaged in a planned program of walking off, remaining away from, striking the work of, and picketing plaintiff, with the objective of forcing and requiring plaintiff to cease doing business with the Corps of Engineers, and of forcing and requiring the assignment of the work of operating and maintaining a job site ambulance to employees working as drivers, represented by defendant, rather than to employees of Chrysler Corporation represented by another teamster local.

■ By reason of defendant's wrongful and unlawful conduct of walking off, remaining away from, striking and picketing work, in violation of its labor agreement, which activity or conduct is defined as unfair labor practice for a labor organization or its agents (29 U. S.C.A. § 158(b)), and as a result of defendant's wrongful and unlawful conduct, plaintiff suffered injury in the amount of $5,353.60, which it was required to pay in rental for construction equipment which was idled by defendant's wrongful acts. Further, plaintiff suffered injury in the amount of $6,-237.85 because its non-manual work force could not work effectively during the time the defendant's wrongful acts were in progress; that plaintiff suffered injury in the amount of $252.82 because it was required to pay rental for office equipment which could not be fully and effectively utilized due to defendant's wrongful acts; and that plaintiff suffered injury in the amount of $810.00 for legal expenses incurred between August 21 and August 24, 1968, as a result of defendant's wrongful acts.

The court adopts the foregoing memorandum as its finding of facts and conclusions of law and a total judgment will be entered for the plaintiff in the sum of $12,654.27.